# IN THE SUPREME COURT OF IOWA

No. 10–1751

Filed March 30, 2012

**STATE OF IOWA,**

Appellee,

vs.

**CHARLES JAMES DAVID OLIVER,**

Appellant.

Appeal from the Iowa District Court for Guthrie County, Bradley McCall, Judge.

Appellant claims sentence of life in prison without parole for a second conviction of sexual abuse in the third degree is cruel and unusual punishment in violation of the State and Federal Constitutions. **AFFIRMED.**

Mark C. Smith, State Appellate Defender, and Rachel C. Regenold, Assistant State Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Elisabeth S. Reynoldson, Assistant Attorney General, Mary L. Benton, County Attorney, and Becky S. Goettsch, Assistant Attorney General, for appellee.

**ZAGER, Justice**.

Charles Oliver was convicted a second time of third-degree sexual abuse in violation of Iowa Code sections 709.1 and 709.4(2)(*b*) (2009). Oliver stipulated that he had a prior conviction for third-degree sexual abuse under sections 709.1 and 709.4. Because of his prior conviction, Oliver was guilty of a class "A" felony under the enhanced sentencing provisions of section 902.14(1), and the district court accordingly sentenced Oliver to life in prison without the possibility of parole. *See* Iowa Code § 902.1 (requiring life without parole for class "A" felonies). Oliver appealed, claiming the sentence of life without parole constituted cruel and unusual punishment in violation of the Eighth Amendment of the United States Constitution and article I, section 17 of the Iowa Constitution. Oliver claims the statute is unconstitutional both on its face and as applied to him. We retained jurisdiction, and we now affirm Oliver's sentence.

## I. Factual Background and Procedural History.

On October 27, 2009, R.A., a thirteen-year-old girl, had an argument with her mother. R.A. called a close family friend, Bryan Conley, who lived nearby to ask if she could spend the night. R.A. did not have contact with her father, and according to Conley, R.A., and her mother, Conley was a father figure to R.A. Conley and R.A.'s mother agreed that R.A. could spend the night at Conley's residence. Conley's long-time friend, Charles Oliver, who was thirty-three years old at the time, had been picked up earlier in the evening and spent the night at the same house as Conley and R.A.[1] The next morning, Conley and his fiancée left the house, leaving Oliver and R.A. alone. While the two were

---

[1]Oliver and his wife were separated at the time, and Oliver had been removed from his residence.

alone, R.A. told Oliver that she liked him. They went to the basement and had sex on Conley's bed one or two times. R.A. then fell asleep. Prior to his leaving, Oliver gave R.A. his cell phone number.

Around December 17, R.A.'s mother went through R.A.'s cell-phone records and found several text messages between R.A. and Oliver. R.A's mother confronted Oliver about these calls and messages and Oliver said, "I'm just her friend like Bryan [Conley]." R.A.'s mother reminded Oliver that R.A. was thirteen and he was thirty-three. Shortly thereafter, R.A. told her mother about having sex with Oliver. R.A.'s mother then called the West Des Moines Police Department and reported that Oliver was attempting to contact R.A. and may have sexually abused her.

Oliver was in the Polk County jail on an unrelated charge on January 8, 2010. While there, Oliver's wife confronted him with the voicemails R.A. had left for Oliver on his cell phone. During this telephone conversation, Oliver admitted having sex with R.A.[2] On April 8, a warrant was issued for Oliver's arrest, and he was placed in the Guthrie County jail.

Oliver was charged by trial information with two counts of third-degree sexual abuse in violation of Iowa Code sections 709.1(3) and 709.4(2)(*b*). The State subsequently dismissed one count of the indictment. Trial commenced on September 8. At trial, Oliver denied having sex with R.A. On September 10, 2010, the jury found Oliver guilty of sexual abuse in the third degree. Following the guilty verdict, Oliver stipulated that he had a prior conviction for third-degree sexual

---

[2]Oliver later told another inmate that he had consensual sex with a thirteen-year-old and that he did not understand why he would be sentenced to life without parole for that offense.

abuse in 2000. Based upon this admission, the court entered its judgment order finding Oliver guilty of the enhanced class "A" felony under section 902.14.

The sentencing hearing was conducted on October 18. According to the presentence investigation report (PSI), Oliver claimed that his prior conviction was for consensual sex with a fifteen-year-old victim. However, the record reflects that the victim in the first case was fourteen, and Oliver's attorney stated this at sentencing. At the time of this conviction, Oliver would have been twenty-four years of age. Oliver claimed that the earlier victim had a fake ID and that he was residing with her. Oliver's PSI also revealed an extensive criminal history in addition to the sexual abuse convictions, including convictions for theft, burglary, terrorism, supplying alcohol to a minor, criminal mischief, driving while barred, domestic abuse assault, OWI first offense, harassment of a public officer, and violation of the sex offender residency law. In the PSI, Oliver was entitled to provide his version of events. According to Oliver, "the punishment really should be shared. Everyone knows right from wrong."

At sentencing, the State made a record to support its contention that life without parole was an appropriate sentence for Oliver and was not cruel and unusual punishment. The State pointed out Oliver's substantial prior criminal record, his failure to successfully complete his probation resulting in revocation and imprisonment, and his failure to complete court-ordered sex-offender treatment. As part of the sentencing record, R.A. and her mother gave victim impact statements. R.A. noted she had been in residential treatment for eight months as a result of the incident and was continuing in therapy. She stated that Oliver molested her and made her believe he loved her. She stated, "I was a 13-year–old

little girl and he took my life away . . . ." R.A.'s mother also provided an impact statement expressing how this had affected R.A.

At sentencing, Oliver's attorney minimized the offenses in the record and claimed life without parole was "completely out of proportion" to Oliver's offense based on the facts of this case and his record. He argued the statute was designed "to capture sexual predators who are constantly preying on children or rapists who can't stop raping." During his allocution, Oliver stated that he did not think life in prison was appropriate because he "didn't put a gun to anyone's head." The district court sentenced Oliver to life without parole pursuant to section 902.14. Oliver appealed.

On appeal, Oliver makes both a facial and as-applied challenge to his sentence. He claims the sentence constitutes cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution and article I, section 17 of the Iowa Constitution.

## II.  Standard of Review and Preservation of Error.

Oliver claims his sentence violates the State and Federal Constitutions and is therefore illegal. We have held that "[a] defendant may challenge an illegal sentence at any time." *State v. Bruegger*, 773 N.W.2d 862, 869 (Iowa 2009); *see also* Iowa R. Crim. P. 2.24(5)(*a*). Regarding our standard of review, "[t]his court reviews constitutional claims de novo." *Bruegger*, 773 N.W.2d at 869.

Under section 902.14(1), "[a] person commits a class 'A' felony if the person commits a second or subsequent offense involving any combination of" second-degree sexual abuse, third-degree sexual abuse, or lascivious acts with a child. Iowa Code § 902.14(1)  A class "A" felon faces a life sentence without the possibility of parole "unless the governor commutes the sentence to a term of years." *Id.* § 902.1.  Oliver claims

that section 902.14 is unconstitutional on its face and as applied to him. Though Oliver cites to both the Eighth Amendment to the United States Constitution and article I, section 17 of the Iowa Constitution, he explicitly limits his challenge to the Iowa Constitution, claiming that the Federal Constitution does not afford any additional protection. *See Bruegger*, 773 N.W.2d at 886 n.9. However, since *Bruegger* was decided, the United States Supreme Court decided *Graham v. Florida*, ___ U.S., ___, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010), a case which sheds new light on the federal framework for the cruel and unusual punishment analysis. In light of the recently clarified framework, we will analyze Oliver's claim under both the state and federal constitutional provisions that prohibit cruel and unusual punishment.

**III. The Current State of Federal Cruel and Unusual Punishment Jurisprudence.**

It is important to clarify the terminology of cruel and unusual punishment jurisprudence. Following *Graham*, unlike other areas of constitutional law, the federal lexicon for Eighth Amendment analysis no longer includes the terms "facial challenge" and "as-applied challenge." Instead, the defendant must challenge his sentence under the "categorical" approach or make a "gross proportionality challenge to [the] particular defendant's sentence." *See Graham*, ___ U.S. at ___, 130 S. Ct. at 2022, 176 L. Ed. 2d at 837.

Oliver claims section 902.14 is "unconstitutional on its face." To support this claim, Oliver proceeds through a three-step analysis. Step one requires us to compare the severity of the punishment to the gravity of the crime to determine if the sentence leads to an inference of gross disproportionality. *Bruegger*, 773 N.W.2d at 873. If this threshold step is satisfied, steps two and three require the court to engage in an

intrajurisdictional and interjurisdictional analysis to determine whether the sentence is in fact grossly disproportionate and therefore a violation of the Eighth Amendment. *See Ewing v. California,* 538 U.S. 11, 22, 30, 123 S. Ct. 1179, 1186, 1190, 155 L. Ed. 2d 108, 118, 123 (2003); *Harmelin v. Michigan,* 501 U.S. 957, 1005, 111 S. Ct. 2680, 2707, 115 L. Ed. 2d 836, 871 (1991) (Kennedy, J., concurring in part and concurring in judgment) ("A better reading of our cases leads to the conclusion that intrajurisdictional and interjurisdictional analyses are appropriate only in the rare case in which a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality."). In *Graham,* the Supreme Court noted that "[t]he approach in cases such as *Harmelin* and *Ewing* is suited for considering a gross proportionality challenge to a *particular defendant's sentence* . . . ." *Graham,* ___ U.S. at ___, 130 S. Ct. at 2022, 176 L. Ed. 2d at 837 (emphasis added). Thus, under the federal framework as clarified in *Graham,* the three-step approach that Oliver seeks to use in his "facial" challenge is actually the approach the United States Supreme Court would take when evaluating a challenge to a particular defendant's sentence.

The Supreme Court took a different approach when reviewing a "categorical" challenge to a term-of-years sentence. *See id.* The approach taken in *Graham* was based on the framework and analysis developed in *Kennedy v. Louisiana,* 554 U.S. 407, 128 S. Ct. 2641, 171 L. Ed. 2d 525 (2008), *Roper v. Simmons,* 543 U.S. 551, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005), and *Atkins v. Virginia,* 536 U.S. 304, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002). *Id.* at ___, 130 S. Ct. at 2022–23, 176 L. Ed. 2d at 837. Under the categorical approach, the question is whether a particular *sentencing practice* violates the Eighth Amendment. *Id.* The

Supreme Court looked to "objective indicia of national consensus" regarding the use of a particular punishment, and also made an independent analysis of constitutionality of the penalty based on "the culpability of the offenders at issue in light of their crimes and characteristics, along with the severity of the punishment in question." *Id.* at \_\_\_, 130 S. Ct. at 2023, 2026, 176 L. Ed. 2d at 837, 841.

As part of this independent analysis, the Supreme Court "also considers whether the challenged sentencing practice serves legitimate penological goals." *Id.* at \_\_\_, 130 S. Ct. at 2026, 176 L. Ed. 2d at 841. The Supreme Court has used the "categorical" approach to determine that a death sentence is always cruel and unusual punishment for the crime of child rape when the victim did not die or death was not intended. *See Kennedy,* 554 U.S. at 412, 128 S. Ct. at 2646, 171 L. Ed. 2d at 534. It has also determined that the death penalty is always cruel and unusual punishment when imposed on minors or the mentally challenged. *See Roper,* 543 U.S. at 578–79, 125 S. Ct. at 1200, 161 L. Ed. 2d at 28; *Atkins,* 536 U.S. at 321, 122 S. Ct. at 2252, 153 L. Ed. 2d at 350. In *Graham,* the Supreme Court applied the "categorical" approach for the first time outside the context of the death penalty and held that life without parole was an unconstitutional punishment for a nonhomicide crime committed when the offender was under eighteen years old. *Graham,* \_\_\_ U.S. at \_\_\_, 130 S. Ct. at 2022, 2034, 176 L. Ed. 2d at 837, 850. We will now proceed to Oliver's categorical and particularized challenges under the federal framework.

### IV. Categorical Challenge Under the Federal Constitution.

We start by noting that Oliver has not technically made a "categorical challenge" to his sentence. However, he has argued that life without parole for a violation of section 902.14 is unconstitutional "on its

face." We will treat this argument as a categorical challenge under the federal framework. As noted above, categorical challenges to a particular sentence can be based on either the characteristics of the crime or the criminal. In this case, Oliver argues life without parole is an unconstitutional penalty for a violation of section 902.14. Following the Supreme Court's guidance in *Graham*, we will first look for evidence of a national consensus against the use of this penalty for this crime. *See Graham*, ___ U.S. at ___, 130 S. Ct. at 2023, 176 L. Ed. 2d at 837. We will then move on to an independent analysis where we consider the culpability of the offenders, as well as the severity of their crimes, and whether legitimate penological goals are served by the punishment of life without parole. *See id.* at ___, 130 S. Ct. at 2026, 176 L. Ed. 2d at 841.

**A. A National Consensus.** Section 902.14 makes a second or subsequent conviction of second-degree sexual abuse, third-degree sexual abuse or lascivious acts with a child a class "A" felony. The acts that trigger section 902.14 are acts contained in sections 709.3, 709.4, 709.8(1), and 709.8(2). Iowa Code § 902.14. Violations of section 709.3 include acts of sexual abuse where the person displays a dangerous weapon, or uses or threatens force creating a substantial risk of death or serious injury to any person; the victim is under the age of twelve, or the person is aided or abetted by others and the sex act is committed by force or against the will of the victim. *Id.* § 709.3. Violations of section 709.4 include sex acts done by force or against the will of the victim, sex acts between persons not cohabiting as husband and wife, where the victim is suffering from a mental defect which precludes giving consent, or the victim is twelve or thirteen years of age, or the victim is fourteen or fifteen years of age and the perpetrator is either a member of the same household, is related to the victim, exploits a position of authority over

the victim, or is four or more years older than the victim. *Id.* § 709.4(1–2). Violations of section 709.4 also include performing a sex act on a victim who is under the influence of a controlled substance and the perpetrator knows or should have known the victim is incapable of consent. *Id.* § 709.4(3). Violations of sections 709.8(1) and (2) involve fondling a child or permitting or causing a child to fondle the perpetrator. *Id.* § 709.8. The statute shows the legislature's clear intent to deal with repeat offenders more severely than first-time offenders.

"[T]he 'clearest and most reliable objective evidence of contemporary values is the legislation enacted by the country's legislatures.' " *Graham,* ___ U.S. at ___, 130 S. Ct. at 2023, 176 L. Ed. 2d at 837 (citation omitted). As Oliver's brief demonstrates, Iowa is not an outlier by punishing a second or subsequent conviction of statutory rape with life in prison. Arizona, California, Connecticut, Delaware, Indiana, Iowa, Louisiana, Minnesota, Missouri, New Hampshire, New Mexico, New York, Oklahoma, Pennsylvania, Washington, and Wisconsin, as well as the federal government, authorize life in prison for those convicted of sexual offenses against children on two or three separate occasions, though not all these states also remove the possibility of parole.[3] As

---

[3]*See* 18 U.S.C. § 3559(e)(1) (2006) (mandating life in prison for a second sex conviction where a minor was the victim, unless death is imposed); Ariz. Rev. Stat. Ann. § 13-705(C), (D), (I) (West, Westlaw through Feb. 16, 2012 of 2d Reg. Sess.) (mandating life without parole for at least thirty-five years for a third or subsequent conviction); Cal. Penal Code § 667.71(West, Westlaw through ch. 7 of 2012 Reg. Sess.) (imposing a sentence of twenty-five years to life for a second or subsequent conviction); Conn. Gen. Stat. Ann. §§ 53a-35b, 53a-40(b), (i) (West, Westlaw through 2012 Supp.) (imposing a life sentence on persistent sexual offenders and defining a life sentence as a sixty-year sentence); Del. Code Ann. tit. 11, § 4205A(a) (authorizing a sentence of twenty-five years to life for a second offense or any offense where the victim is less then fourteen years of age) (West, Westlaw through 78 Laws 2011, chs. 1–203); Ind. Code Ann. §§ 35-42-4-3(a)(1), 35-50-2-8.5(b) (West, Westlaw through 2011 1st Reg. Sess.) (making sexual intercourse with a person under age fourteen a class "A" felony if the perpetrator is over twenty-one and authorizing the prosecution to seek a life without parole (LWOP) sentence for a second such offence); Iowa Code § 902.14; La. Rev. Stat. Ann.

Oliver notes, in six states and the federal government, life without parole (LWOP) is the exclusive penalty for certain repeat offenders.[4] Three more states authorize life without parole in certain circumstances.[5] Connecticut allows for parole for certain repeat sex offenders, but only after they have served sixty years.[6] These statutes contain small differences, such as the age of the victim or the age difference between the victim and the offender. However, it is clear that Iowa is anything

---

§ 15:537(B) (West, Westlaw through 1st Ext. and Reg. Sess.) (mandating LWOP for a third sexual offense); Minn. Stat. Ann. § 609.3455(4) (West, Westlaw through 2012 Reg. Sess. through ch. 125) (mandating life with the possibility of parole if a person is convicted of certain crimes and has two previous sex offenses); Mo. Ann. Stat. § 558.018(2)–(6) (West, Westlaw through 2011 1st Ext. Sess.) (mandating LWOP for a second conviction of certain offenses and life with the possibility of parole for a second conviction of other offenses); N.H. Rev. Stat. Ann. §§ 632-A:2, -A:10-a(III) (Westlaw through ch. 272 of the 2011 Reg. Sess.) (mandating LWOP for those convicted of a third offense); N.M. Stat. Ann. §§ 30-9-11, 31-18-25 (A), (B), (F) (West, Westlaw through 2011 legislation) (mandating life in prison for a second conviction of criminal sexual penetration and not allowing parole if the victim of each offense is under thirteen); N.Y. Penal Law § 70.07(4) (McKinney, Westlaw through L. 2011, chs. 1 to 604) (mandating a sentence of twenty-five years to life for a second sexual assault against a child); Okla. Stat. Ann. tit. 21, § 51.1a (West, Westlaw through ch. 385 of the 1st Reg. Sess. 2011) ("Any person convicted of . . . sexual abuse of a child after having been convicted of . . . sexual abuse of a child shall be sentenced to life without parole."); 42 Pa. Cons. Stat. Ann. §§ 9718.2(a)(2), 9795.1(a), (b) (West, Westlaw through 2011 Reg. Sess.) (mandating life in prison for a third or subsequent conviction of a variety of sexual offenses); Wash. Rev. Code Ann. §§ 9.94A.030, 9.94A.570, 9A.44.076 (West, Westlaw through 2011 2d Spec. Sess & 2012 legislation effective through Mar. 6, 2012) (mandating LWOP for persistent offenders and defining persistent offenders as those with a second conviction for a variety of crimes); Wis. Stat. Ann. §§ 939.62(2m)(b)(2), (2m)(c), 948.02 (West, Westlaw through 2011 Act 115) (mandating LWOP for persistent repeaters, which are those are those convicted of a second serious child sex offense).

[4]*See* 18 U.S.C § 3559(e)(1); La. Rev. Stat. Ann. § 15:537(B); Minn. Stat. Ann. § 609.3455; N.H. Rev. Stat. Ann. §§ 632-A:2, -A:10-a(III); Okla. Stat. Ann. tit. 21, § 51.1a; Wash. Rev. Code Ann. §§ 9.94A.030, 9.94A.570, 9A.44.076; Wis. Stat. Ann. §§ 939.62(2m)(b)(2), (2m)(c), 948.02.

[5]Ind. Code Ann. § 35-50-2-8.5; Mo. Ann. Stat. § 558.018; N.M. Stat. Ann. §§ 30-9-11, 31-18-25.

[6]*See* Conn. Gen. Stat. Ann. §§ 53a-35b, 53a-40(b), (i).

but an "outlier" when it comes to the severe treatment of repeat sexual offenders who target children, use force, or prey on the incapacitated.[7]

The Supreme Court has also noted that " '[t]here are measures of consensus other than legislation[,]' " and, therefore, "[a]ctual sentencing practices are an important part of the Court's inquiry into consensus." *Id.* at ___, S. Ct. at 2023, 176 L. Ed. 2d at 838 (citation omitted). Neither party has provided statistics of how many people are currently serving life without parole sentences for repeat sex crimes. Given the diverse language contained in these statutes, and the fact that triggering crimes may be worded in slightly different ways, or require a different number of convictions to trigger life without parole, such a survey is likely not a feasible option. However, we can look to other states' judicial review of these statutes to inform our analysis of whether a national consensus has formed that life without parole for repeat sex offenders is cruel and unusual punishment.

Oliver points to only two cases that support his claim that Iowa punishes the type of conduct he engaged in more harshly than other jurisdictions. In *State v. Davis*, 79 P.3d 64 (Ariz. 2003) (en banc), the Arizona Supreme Court reviewed a nineteen-year-old male's sentence of "fifty-two years in prison for having non-coerced sex with two post-pubescent teenage girls." *Davis*, 79 P. 3d at 66, 71. Davis was convicted of four counts and received a thirteen-year sentence for each count, which, by law, had to be served consecutively. *Id.* at 67. The court found the sentence was grossly disproportionate to the crimes. *Id.* at 72, 75. However, the court noted the defendant did not have an adult

---

[7]As Oliver notes, many other states enhance the sentences of repeat offenders in general, while not singling out repeat sex offenders. This further supports the idea that there is not a national consensus against using enhanced punishment for recidivist sex offenders.

criminal record and had not previously committed any crimes against children. *Id.* at 72. The Arizona Supreme Court later noted that the holding in *Davis* "rested on the 'specific facts and circumstances of Davis's offenses.'" *State v. Berger*, 134 P.3d 378, 386 (Ariz. 2006) (en banc) (quoting *Davis*, 79 P.3d at 74–75). In *Berger*, the defendant was convicted of twenty counts of sexual exploitation of a minor for possession of child pornography depicting a minor under the age of fifteen. *Id.* at 379. At the time of his arrest, the defendant did not have a criminal record. *Id.* at 387. Because the child was under age fifteen, the offense was characterized as a dangerous offense against children, and Berger's sentences had to be served consecutively without any possibility of parole. *Id.* at 379. The court rejected Berger's cruel and unusual punishment claims, refusing to consider the consecutive sentences in the proportionality decision, as the court had done in *Davis. Id.* at 385. The *Berger* decision limits *Davis*'s holding to the facts of that case, making the holding more like an as-applied challenge, as opposed to a facial challenge. *Id.* at 387. Oliver's long criminal history, combined with his past sexual crime against a child, make *Davis* clearly distinguishable.

Oliver also cites *Bradshaw v. State*, 671 S.E.2d 485 (Ga. 2008), as the only decision to hold a recidivist sex offender sentence enhancement was cruel and unusual. That case involved a statute that mandated a life sentence after a second conviction for failure to register as a sex offender. *Bradshaw*, 671 S.E.2d at 487. Georgia was the only state to impose such a harsh penalty. *Id.* at 491. Only two other states authorized a penalty over ten years and many authorized only a fraction of that amount. *Id.* at 491–92. The Georgia court noted its punishment was the "clear outlier." *Id.* at 492.

Aside from *Davis* and *Bradshaw*, Oliver has not provided this court with any other examples of state supreme courts declaring enhanced punishments for sexual offenders to be unconstitutional. By Oliver's own admission, *Bradshaw* is the only case to declare an enhanced punishment for a recidivist to be cruel and unusual. The state and federal courts have both reviewed a Washington statute that is nearly identical to Iowa's. Washington's statute imposes LWOP under a "two strikes" law that is similar to section 902.14. *See* Wash. Rev. Code Ann. §§ 9.94A.030(37)(b), 9.94A.570, 9A.44.076.[8] In *State v. Gimarelli*, 20 P.3d 430 (Wash. Ct. App. 2001), the Washington Court of Appeals upheld Washington's two-strikes law where the defendant's first conviction was for forcible rape of an adult and his second offense was attempted child molestation in the first degree. *Gimarelli*, 20 P.3d at 436. The victim was an eleven-year-old girl. *Id.* The court noted, "The Legislature has a right to discourage such behavior and protect the public from such offenders." *Id.*

On de novo review, the Ninth Circuit also found the two strikes law was constitutional. *Norris v. Morgan*, 622 F.3d 1276, 1279 (9th Cir. 2010), *cert. denied*, 131 S. Ct. 1557 (2011). In *Norris*, the defendant was sentenced to life without parole for a conviction of first-degree child molestation. *Norris*, 622 F.3d at 1279. Because he was convicted of child molestation ten years earlier, Washington law mandated a sentence

---

[8]Under Washington law, a person is guilty of second degree child rape if "the person has sexual intercourse with another who is at least twelve years old but less than fourteen years old and not married to the perpetrator and the perpetrator is at least thirty-six months older than the victim." Wash. Rev. Code. Ann. § 9A.44.076(1). Two convictions of second-degree child rape makes one a "persistent offender." *Id.* § 9.94A.030(37)(b). A persistent offender receives a life sentence without the possibility of parole. *Id.* § 9.94A.570.

of life without parole. *Id.* The Ninth Circuit discussed the Washington Court of Appeals' interjurisdictional analysis which concluded that

> "[m]ost states that have 'two strikes' laws require sex offenses with some degree of penetration and infliction of serious bodily harm." In addition, according to the state appellate court, only "[a] small[] number of states would impose a sentence of life in prison without parole for a second offense after a similar prior offense. For example, Georgia, Montana, New Mexico, South Carolina, and Wisconsin all have two strikes laws for some types of sexual offenses."

*Id.* at 1284 (quoting *State v. Norris*, 116 Wash. App. 1006, 2003 WL 827647, at *3 (2003)). The Washington Court of Appeals went on to note that this factor alone was not dispositive because the intrajurisdictional analysis revealed this type of sentence was imposed for other crimes in Washington. *Id.* at 1283. The court held the sentence was not grossly disproportionate. *Id.* at 1284. Norris filed a petition for a writ of habeas corpus. *Id.*

The Ninth Circuit was asked to determine whether upholding Norris's sentence was " 'contrary to, or involved an unreasonable application of' the proportionality principle" embodied in the Eighth Amendment. *Id.* at 1287. Because the Washington court had only analyzed the law under the Washington Constitution, the Ninth Circuit engaged in a de novo review under the Eighth Amendment's framework, the same framework used in Iowa. *See id.* at 1283, 1289–90; *see also Bruegger*, 773 N.W.2d at 883. The Ninth Circuit noted that even though life without parole was an incredibly harsh sentence, it was "justified by the gravity of [Norris's] most recent offense and criminal history." *Norris*, 622 F.3d at 1291. After noting the particular danger the legislature sought to avoid by harshly punishing recidivist sex offenders, the court concluded, stating

> Norris's sentence "reflects a rational legislative judgment, entitled to deference," that sex offenders who have committed a serious or violent sex offense and who continue to commit such sex offenses must be permanently incapacitated. Norris's thus is not " 'the rare case in which a threshold comparison of the crime committed and the sentences imposed leads to an inference of gross disproportionality,' " and we need go no further.

*Id.* at 1296 (citations omitted).

The Wisconsin Court of Appeals upheld Wisconsin's "two-strikes" law for sexual offenders in 2004, stating simply "the legislature 'could reasonably determine that the need for incarceration without the possibility of parole is especially acute when children, a particularly vulnerable segment of the population, are the explicit targets of the offenses.' " *State v. Lewis,* 690 N.W.2d 668, 673 (Wis. Ct. App. 2004) (quoting *State v. Radke,* 657 N.W.2d 66, 75 (Wis. 2003)). Courts that have found sentences unconstitutional when applied to minors still note those same sentences would be appropriate when applied to adults. *See, e.g., Humphrey v. Wilson,* 652 S.E.2d 501, 509 (Ga. 2007) ("[W]e must acknowledge that Wilson's crime does not rise to the level of culpability of adults who prey on children and that, for the law to punish Wilson as it would an adult, with [an] extraordinarily harsh punishment . . . appears to be grossly disproportionate to his crime."). In short, national consensus seems to support, rather than oppose, the imposition of harsh sentences, including life without parole, for recidivist sex offenders.

Oliver notes that the penalty of life without parole is reserved for very few crimes in Iowa and is imposed only when an offender commits first-degree murder, first-degree sexual abuse, first-degree kidnapping, a violation of section 902.14, or a violation of section 124.401D.[9] Under

---

[9]Though his argument is framed under the "intrajurisdictional" component of the *Harmelin* analysis, the fact that life without parole is available for those who commit

section 124.401D, a person over age eighteen who is twice convicted of manufacturing methamphetamine for delivery to a minor or twice convicted of possessing methamphetamine with the intent to deliver it to a minor is guilty of a class "A" felony and will be sentenced to life without parole. *See* Iowa Code § 124.401D; *id.* § 902.1. By imposing life without parole on those who twice violate one of the prohibitions found in section 124.401D, the legislature has made it clear that recidivists who repeatedly prey on the vulnerability of children will receive Iowa's harshest penalty. Those who commit sexually based crimes also receive lengthy sentences under Iowa law, as evidenced by the penalties imposed for a single violation of sections 709.3, 709.4, or 709.8(1) or (2). In the view of the legislature, those who commit sexual crimes also pose special recidivist concerns. In response to those concerns, the legislature has established a variety of safeguards that apply only to sexual offenders. *See* Iowa Code §§ 229A.1–.16 (civil commitment of sexually violent predators); *id.* §§ 692A.1–.16 (sex offender registration); *id.* §§ 903B.1–.10 (sex offender hormone treatment). These concerns over recidivist sex offenders do not give the legislature free reign to punish sex offenders in any way it sees fit, but they do help define "the evolving standards of decency that mark the progress of a maturing society" which give meaning to the Eighth Amendment. *Trop v. Dulles*, 356 U.S. 86, 101, 78 S. Ct. 590, 598, 2 L. Ed. 2d 630, 642 (1958). Iowa's treatment of sex offenders and those who repeatedly prey on children further convinces us that there is not a consensus against this harsh penalty for the conduct subject to section 902.14.

---

multiple less serious crimes informs our analysis of whether a consensus has been reached that life without parole can only be imposed for the worst crimes.

**B. The Offender's Culpability and the Goals of Punishment.** In addition to considering whether there is a national consensus against the punishment based on objective criteria, a reviewing court must also make an independent judgment of whether the sentence violates the constitution. *Graham,* ___ U.S. at ___, 130 S. Ct. at 2026, 176 L. Ed. 2d at 841. Part of this analysis must determine "whether the challenged sentencing practice serves legitimate penological goals." *Id.* "A sentence lacking any legitimate penological justification is by its nature disproportionate to the offense." *Id.,* ___ U.S. at ___, 130 S. Ct. at 2028, 176 L. Ed. 2d at 843. The United States Supreme Court has recognized four legitimate penological justifications: retribution, deterrence, incapacitation, and rehabilitation. *Id.* By making multiple violations of sections 709.3, 709.4, and 709.8(1) and (2) a class "A" felony, punishable only by life in prison without parole, the legislature has completely rejected rehabilitation as a goal of punishment. *See generally* Julia Fong Sheketoff, *State Innovations in Noncapital Proportionality Doctrine,* 85 N.Y.U. L. Rev. 2209, 2226 (2010) ("LWOP is the only noncapital sentence that wholly rejects rehabilitation as a goal of punishment. The sentence is unique in that, by definition, it requires that the offender die in prison."). However, "[c]riminal punishment can have different goals, and choosing among them is within a legislature's discretion." *Graham,* ___ U.S. at ___, 130 S. Ct. at 2028, 176 L. Ed. 2d at 843. In this case, we are reviewing a statute that increases punishment for recidivist sex offenders. The Supreme Court has noted that "[r]ecidivism has long been recognized as a legitimate basis for increased punishment." *Ewing,* 538 U.S. at 25, 123 S. Ct. at 1188, 155 L. Ed. 2d at 120. Enhancing punishment based on recidivism fulfills the legitimate goals of

incapacitation and deterrence. *Id.* at 26, 123 S. Ct. at 1187–88, 155 L. Ed. 2d at 121.

When examining retribution, the Supreme Court has stated that "the heart of the retribution rationale is that a criminal sentence must be directly related to the personal culpability of the criminal offender." *Graham*, ___ U.S. at ___, 130 S. Ct. at 2028, 176 L. Ed. 2d at 843 (citation and internal quotation marks omitted). The goal of retribution is "restoration of the moral imbalance caused by the offense." *Id.* In order to fully examine the culpability of a person who is subject to section 902.14, we feel it is also appropriate to analyze the scope of the prior and triggering crimes, as well as the scope of the statute that enhances the defendant's sentence. Section 902.14, which enhanced Oliver's conviction to a class "A" felony, covers a relatively narrow set of conduct. Only a second violation of section 709.3 (second-degree sexual abuse), 709.4 (third-degree sexual abuse) or 709.8(1) and (2) (fondling a child or causing a child to fondle the perpetrator) will trigger section 902.14. Unenhanced, each of these offenses is a class "B" or "C" felony. Iowa Code §§ 709.3, .4, .8. Also, only a conviction or deferred judgment will trigger section 902.14, not an adjudication of juvenile delinquency. *Id.* § 902.14(2). The Supreme Court has noted that juveniles are less culpable than adults. *See Graham*, ___ U.S. at ___, 130 S. Ct. at 2028, 176 L. Ed. 2d at 843–44. By limiting section 902.14 to convictions as opposed to adjudications of delinquency, the legislature has attempted to avoid enhancing the punishment of less culpable offenders. The scope of section 902.14 weighs against finding Oliver's sentence to be cruel and unusual.

Since life without parole serves at least three legitimate goals, and is supported by a national consensus, we find the Eighth Amendment

does not categorically ban the imposition of life without parole for persons subject to the imposition of section 902.14.

**V. The Challenge to This Particular Defendant's Sentence Under the State and Federal Constitutions.**

Having determined the penalty mandated by section 902.14 does not violate any categorical limitations imposed by the State or Federal Constitutions, we now turn to Oliver's claim that the penalty mandated by that statute is so grossly disproportionate to the crimes he committed that following the statute would, in this case, violate the State or Federal Constitutions.

Oliver challenges his sentence by claiming it is grossly disproportionate to his crime using the three-step analysis first articulated in *Solem v. Helm*, 463 U.S. 277, 103 S. Ct. 3001, 77 L. Ed. 2d 637 (1983). *See Bruegger*, 773 N.W.2d at 873. The first step in this analysis, sometimes referred to as the threshold test, requires a reviewing court to determine whether a defendant's sentence leads to an inference of gross disproportionality. *Id.* "This preliminary test involves a balancing of the gravity of the crime against the severity of the sentence." *Id.* If, and only if, the threshold test is satisfied, a court then proceeds to steps two and three of the analysis. *Id.* These steps require the court to engage in an intrajurisdictional analysis "comparing the challenged sentence to sentences for other crimes within the jurisdiction." *Id.* Next, the court engages in an interjurisdictional analysis, "comparing sentences in other jurisdictions for the same or similar crimes." *Id.*

At the time *Bruegger* was decided, we observed that the role of individualized challenges under the Federal Constitution was unclear. *See id.* at 874–76. We noted that in *Rummel v. Estelle*, 445 U.S. 263, 100

S. Ct. 1133, 63 L. Ed. 2d 382 (1980), and in *Solem*, the Supreme Court favored an individualized challenge to a defendant's sentence outside of the capital punishment context. *Id.* at 875. However, we noted that in *Harmelin* the plurality of the Court seemed to retreat from allowing individualized challenges under the Eighth Amendment. *Bruegger*, 773 N.W.2d at 875 (citing *Harmelin*, 501 U.S. at 995, 111 S. Ct. at 2701–02, 115 L. Ed. 2d at 865). In a concurring opinion joined by two of the five justices that comprised the plurality in *Harmelin*, Justice Kennedy discussed the defendant's challenge as "a comparison of *his* crime with *his* sentence." *Harmelin*, 501 U.S. at 1005, 111 S. Ct. at 2707, 115 L. Ed. 2d at 872 (Kennedy, J., concurring) (emphasis added). Though Justice Kennedy stopped short of requiring the type of individualized sentencing procedure that is required in capital cases, his concurrence makes clear that the three-step analysis the Supreme Court used in *Solem* requires a comparison between a defendant's sentence and his particular crime. *Id.* at 1006, 111 S. Ct. at 2707, 115 L. Ed. 2d at 872.

Justice Kennedy's use of the three-part test on an individualized basis outside of the capital punishment context gained support in the Supreme Court's next major Eighth Amendment decision. In *Ewing*, the defendant claimed his sentence of twenty-five years to life in prison under California's three strikes law was grossly disproportionate to his crime: the theft of three golf clubs. *Id.* at 18–20, 123 S. Ct. at 1183–85, 155 L. Ed. 2d at 115–16. Though, as in *Harmelin*, no single opinion commanded a majority, the majority of the justices endorsed the fact-specific analysis Justice Kennedy advocated for in *Harmelin*. *Id.* at 23–24, 123 S. Ct. at 1187, 155 L. Ed. 2d at 119 ("The proportionality principles in our cases distilled in Justice Kennedy's concurrence [in *Harmelin*] guide our application of the Eighth Amendment in [this

context].”); *see also Bruegger*, 773 N.W.2d at 876 (“[A] majority of the Supreme Court in *Ewing* seems to approve of an as-applied challenge to an otherwise valid statute under the Cruel and Unusual Punishment Clause of the Eighth Amendment.”).

After describing the back-and-forth state of as-applied challenges under the Federal Constitution, our *Bruegger* opinion then turned to the possibility of an as-applied challenge under the Iowa Constitution. *Bruegger*, 773 N.W.2d at 884. We noted “that many of our cases reject individualized determinations in connection with cruel-and-unusual-punishment challenges in a number of contexts.” *Id.* at 884. However, we then stated that “we do not believe that a defendant can never challenge a sentence as cruel and unusual as applied.” *Id.* We held that, based on the unique factors of his case, Bruegger was allowed to make an individualized showing that his sentence amounted to cruel and unusual punishment under the Iowa Constitution. *Id.* Since “the current record [was] simply inadequate to resolve the issue,” we remanded the case to the district court “for a new sentencing hearing to allow Bruegger and the State to present evidence as to the constitutionality of [the statute] as applied to the defendant.” *Id.* at 886.

The next year, the United States Supreme Court decided *Graham*. In *Graham*, the Supreme Court stated that the three-step analysis used in *Harmelin* and *Ewing* is not suited for cases where a particular sentencing practice is in question, which, in *Graham*, was the practice of sentencing minors to life in prison for nonhomicide crimes. ___ U.S. at ___, 130 S. Ct. at 2022, 176 L. Ed. 2d at 837. Instead, the Court held the three-step analysis set forth in *Solem* “is suited for considering a

gross proportionality challenge to a particular defendant's sentence."[10] *Id.*

By labeling the three-step analysis as a challenge based on a particular defendant's sentence, the Supreme Court's opinion in *Graham* is now consistent with our holding in *Bruegger*. Therefore, under both the State and Federal Constitutions, a defendant is allowed to challenge his sentence by "emphasizing the specific facts of the case." *Bruegger*, 773 N.W.2d at 884; *see also Graham*, ___ U.S. at __, 130 S. Ct. at 2022, 176 L. Ed. 2d at 837.

Having determined that a defendant may bring an as-applied challenge under the Eighth Amendment to the United States Constitution and article I, section 17 of the Iowa Constitution, we now turn to the question of how such a challenge should proceed. Section 902.14 mandates the sentence of LWOP be imposed on Oliver. Our task is to determine whether following that mandate in this case would amount to cruel and unusual punishment.

Mandatory imposition of the death penalty has been held unconstitutional by the United States Supreme Court. *See Johnson v. Texas,* 509 U.S. 350, 360–61, 113 S. Ct. 2658, 2665, 125 L. Ed. 2d 290, 301 (1993). This is because "[c]apital punishment must be limited to those offenders who commit 'a narrow category of the most serious crimes' and whose extreme culpability makes them 'the most deserving of execution.'" *Roper*, 543 U.S at 568, 125 S. Ct. at 1194, 161 L. Ed. 2d at 21 (citation omitted). Thus, prior to sentencing an offender to death, a

---

[10]In his concurring opinion in *Graham*, Chief Justice Roberts went so far as to argue that the categorical principle should not be expanded beyond the capital punishment context and that all noncapital challenges should be based on the particular facts of each case. *See Graham*, ___ U.S. at __, 130 S. Ct. at 2038–39, 176 L. Ed. 2d at 853 (Roberts, C.J., concurring).

court must make an individualized determination that the offender is worthy of capital punishment.

The Constitution does not require an individualized sentencing proceeding outside the capital punishment context. *Woodson v. North Carolina*, 428 U.S. 280, 304, 96 S. Ct. 2978, 2991, 49 L. Ed. 2d 944, 961 (1976) (noting that, outside the capital punishment context, "[t]he prevailing practice of individualizing sentencing determinations generally reflects simply enlightened policy rather than a constitutional imperative"). Unlike mandatory death sentences, mandatory LWOP sentences have been upheld.[11] *See, e.g., Harmelin*, 501 U.S. at 961, 996, 111 S. Ct. at 2683, 2702, 115 L. Ed. 2d at 843, 865 (upholding a mandatory LWOP sentence of possession of 672 grams of cocaine). Even though the Eighth Amendment does not require individualized sentencing in noncapital cases, a defendant may challenge a mandatory, noncapital sentence as grossly disproportionate to the crime committed. *Harmelin,* 501 U.S. at 1005, 111 S. Ct. at 2707, 115 L. Ed. 2d at 872 (Kennedy, J, concurring). *Bruegger* is an example of such a challenge.

In *Bruegger*, we held the Iowa Constitution allowed an as-applied challenge under the three-part test. We remanded *Bruegger* because "[t]he *Solem*-type approach for evaluating Bruegger's cruel-and-unusual-punishment claim cannot be applied without a proper record." 773 N.W.2d at 886. Creating a proper record would require giving the defendant an opportunity to fully explain the facts and circumstances of

---

[11]The United States Supreme Court has gone so far as to suggest that a mandatory LWOP sentence may be *more* likely to be constitutional than one that is left to the discretion of the sentencing court. *See, e.g., Harmelin*, 501 U.S. at 1006, 111 S. Ct. at 2708, 115 L. Ed. 2d at 872–73 (Kennedy, J., concurring) ("To set aside petitioner's mandatory sentence would require rejection not of the judgment of a single jurist . . . but rather the collective wisdom of the . . . Legislature and, as a consequence, the . . . citizenry.").

his prior offense. *Id.* at 885. It would also involve giving the State a chance to present evidence of the impact on the victim and her family, the defendant's lack of remorse, his inability to respond to rehabilitative services, and the need to incapacitate the defendant. *Id.* at 886. In this case, the court addressed the constitutionality of the sentence mandated by section 902.14 prior to sentencing. At the sentencing hearing, both Oliver and the State presented the type of evidence we felt was lacking in *Bruegger*. Remand in this case is therefore unnecessary.

> In *Bruegger*, we
>
> appl[ied] the general principles as outlined by the United States Supreme Court for addressing a cruel-and-unusual-punishment challenge under the Iowa Constitution.
>
> Even so, we do not necessarily apply the federal standards in the same way as the United States Supreme Court.

*Id.* at 883 (citations omitted). To this end, we reiterate "that review of criminal sentences for 'gross disproportionality' under the Iowa Constitution should not be a 'toothless' review and adopt a more stringent review than would be available under the Federal Constitution." *Id.* Since Oliver has challenged his sentence under the Iowa Constitution, we will apply our more stringent gross-disproportionality review to the facts of his case.

We now turn to the threshold inquiry to determine whether Oliver's sentence of life without parole leads to an inference of gross disproportionality to Oliver's crime. If the sentence does not create an inference of gross disproportionality, then "no further analysis is necessary." *State v. Seering*, 701 N.W.2d 655, 670 (Iowa 2005) (citation and internal quotation marks omitted). Our principal task at this stage

is to "balanc[e] the gravity of the crime against the severity of the sentence." *Bruegger*, 773 N.W.2d at 873.

There are some general principles we must consider when reviewing a defendant's sentence to determine whether it is "grossly disproportionate" to the crime committed. The first is that we owe substantial deference to the penalties the legislature has established for various crimes. As noted earlier, "[c]riminal punishment can have different goals, and choosing among them is within a legislature's discretion." *Graham*, ___ U.S. at ___, 130 S. Ct. at 2028, 176 L. Ed. 2d at 843; *see also Bruegger*, 773 N.W.2d at 872–73; *Seering*, 701 N.W.2d at 670; *State v. Cronkhite*, 613 N.W.2d 664, 669 (Iowa 2000). We give the legislature deference because "[l]egislative judgments are generally regarded as the most reliable objective indicators of community standards for purposes of determining whether a punishment is cruel and unusual." *See Bruegger*, 773 N.W.2d at 873.

The second principle is that it is rare that a sentence will be so grossly disproportionate to the crime as to satisfy the threshold inquiry and warrant further review. *State v. Musser*, 721 N.W.2d 734, 749 (Iowa 2006) (citing *State v. Lara*, 580 N.W.2d 783, 785 (Iowa 1998)); *see also Cronkhite*, 613 N.W.2d at 669. This is true even though our review is more stringent than is required under the Federal Constitution. *See Bruegger*, 773 N.W.2d at 883.

The third principle is that a recidivist offender is more culpable and thus more deserving of a longer sentence than a first-time offender. *See Solem*, 463 U.S. at 296, 103 S. Ct. at 3013, 77 L. Ed. 2d at 653 ("[A] State is justified in punishing a recidivist more severely than it punishes a first offender."). Therefore, when determining the gravity of the offender's crime, a district court can consider the offender's criminal

history.  *See, e.g.*, *Ewing*, 538 U.S. at 29, 123 S. Ct. at 1189–90, 155 L. Ed. 2d at 122 ("In weighing the gravity of Ewing's offense, we must place on the scales not only his current felony, but also his long history of felony recidivism.  Any other approach would fail to accord proper deference to the policy judgments that find expression in the legislature's choice of sanctions."); *see also Bruegger*, 773 N.W.2d at 874.  Lengthy sentences are more likely to be constitutional when imposed on offenders with lengthy criminal histories.  *See Ewing*, 538 U.S. at 29–30, 123 S. Ct. 1189–90, 155 L. Ed. 2d at 122–23.

Finally, we note that the unique features of a case can "converge to generate a high risk of potential gross disproportionality." *Bruegger*, 773 N.W.2d at 884.  The unique factors at issue in *Bruegger* were "a broadly framed crime, the permissible use of preteen adjudications as prior convictions to enhance the crime, and a dramatic sentence enhancement for repeat offenders."[12]   *Id.*   Thus, we must examine the unique combination of the features in Oliver's case as part of our threshold determination regarding the inference of gross disproportionality.

With these general principles in mind, we now turn to Oliver's claim that section 902.14 imposes an unconstitutional penalty on him.  Oliver was sentenced to life without parole for two convictions of third-degree sexual abuse.  As we noted in *Bruegger*, third degree sexual abuse includes what is commonly termed "statutory rape" and is a broadly framed crime:

> The crime of statutory rape covers a wide variety of circumstances, from Romeo and Juliet relationships to much more objectionable situations involving the luring of

---

[12]In *Bruegger*, these factors converged to convince us that the defendant was entitled to bring an as-applied challenge to his sentence under the Iowa Constitution.  773 N.W.2d at 885.  As noted above, it is now clear that such a challenge can be brought, regardless of the presence or absence of these factors.

youngsters by older individuals using manipulative techniques, positions of authority, threats of violence, and other aggravating factors.

*Id.* at 884–85. While a sexual relationship between two preteen children—which was Bruegger's first offense—may resemble a "Romeo and Juliet relationship," Oliver's first and present offenses are "much more objectionable situations." *Id.* While the only criminal aspect of the sexual intercourse between R.A. and Oliver was their extreme age difference, this case is not the type of circumstance that leads us to infer that section 902.14 is grossly disproportionate to Oliver.

At the time of Oliver's first offense, he was twenty-four years old, and his victim was fourteen or fifteen years old. At the time of his present offense, he was thirty-three years old and his victim was thirteen years old. Conley, Oliver's long-time friend, was a father figure to R.A. R.A. was only at Conley's home that evening because of difficulties in her own home life. Oliver knew the nature of the relationship between R.A. and Conley. According to R.A.'s testimony, Oliver told R.A. that he loved her and was going to leave his wife. After the incident, Oliver continued to contact R.A., at one point inviting her to come to his hotel room. In R.A.'s own words at the sentencing hearing,

> [B]ecause of this incident, I went to treatment for eight months and I'm doing therapy at Children and Families of Iowa . . . .
>
> . . . .
>
> . . . [W]e had to move out of our own home. I went to about four different schools. I was in residential treatment and I would like you to know that this man molested me. He made me believe that he loved me and then had sex with me and then left. I trusted him. I was a thirteen-year-old little girl and he took my life away . . . .

This is the type of exploitation section 709.4 was designed to prevent, not conduct that was inadvertently caught by a broadly written statute. *See id.* at 884.

In addition to analyzing the scope of the instant crime, we feel it is also appropriate to analyze the scope of the statute that enhances the defendant's sentence. Like Bruegger, Oliver faces a lengthy sentence after being convicted of the broadly framed crime of third-degree sexual abuse. *Id.* However, Bruegger's sentence was enhanced under section 901A.2, whereas Oliver's enhancement is under section 902.14. *Id.* at 885. Section 901A.2(3) enhances the sentence of anyone convicted of a "sexually predatory offense" that is a felony if that person has a prior conviction for a "sexually predatory offense." Section 901A.1(1) defines a "sexually predatory offense" as any violation of chapter 709, the "C" felonies of sexual exploitation of a minor, enticing a minor under the age of thirteen away or pandering involving a minor, and any attempted violation of any of those statutes. Adjudications of delinquency are included in the definition of "prior convictions." Iowa Code § 901A.1(2).

Section 902.14 covers a much narrower set of conduct. To trigger this section, both the predicate and triggering offenses must be violations of section 709.3 (second-degree sexual abuse), 709.4 (third-degree sexual abuse) or 709.8(1) and (2) (fondling a child or causing a child to fondle the perpetrator). *Id.* § 902.14(1). Each of these offenses is, on its own, a class "B" or "C" felony. *See id.* §§ 709.3, .4, .8(1–2). Also, only a conviction or deferred judgment will trigger section 902.14, not an adjudication of juvenile delinquency. *Compare id.* § 902.14(2), *with id.* § 901A.1(2).

There are fewer predicate crimes that make a defendant eligible for an enhanced punishment under section 902.14. Unlike section 901A.2,

which includes "D" felonies and serious and aggravated misdemeanors as predicate offenses, the predicate offense under section 902.14 must be a "B" or "C" felony. *Compare id.* § 901A.2, with § 902.14(1). Also, only convictions and deferred judgments, as opposed to adjudications of delinquency, trigger section 902.14. Section 902.14 is not as broadly framed as 901A.2, and thus the scope of this statute generates less potential for gross disproportionality than section 901A.2. *See Bruegger*, 773 N.W.2d at 884.

Another factor considered in *Bruegger* was the defendant's "age as a preteen when the predicate offense was committed." *Id.* at 885. If Oliver were a preteen when his predicate offense was committed, this might contribute to an inference that life without parole was grossly disproportionate to the crime. However, Oliver was first convicted of third-degree sexual assault when he was twenty-four years old. He was convicted again at age thirty-four. Unlike Bruegger, Oliver is not seeking "to show that the consequences of his adolescent act become grossly disproportional to his sentence for the adult crime." *Id.* at 885. Oliver's sentence is not based on any crimes he committed in his teens. His crimes were both committed after entering adulthood. Oliver's age at the time of his first offense does not support an inference that this sentence is grossly disproportionate.

Oliver's additional criminal history does not favor an inference of gross disproportionality. According to his PSI, Oliver has nineteen prior convictions in the last sixteen years. Oliver's convictions for supplying alcohol to a minor and a sex offender residency violation are particularly troubling given his current conviction. Offenses relating to Oliver's status as a sex offender are not merely technicalities; the legislature has imposed these requirements because of the "realistic concerns related to

offender recidivism" and the need to limit a recidivist's opportunities to reoffend. *Seering*, 701 N.W.2d at 670.

After his first conviction for third-degree sexual abuse, Oliver's probation was revoked because of his failure to comply with the requirements of supervised probation. Records also indicate that he failed to successfully complete his court-ordered sex offender treatment programming. Oliver claimed at sentencing that he stopped participating in the class because he had been sent back to prison and was therefore "not required to finish the class."

At sentencing, Oliver argued life without parole was an inappropriate sentence because, as he stated,

> I didn't put a gun to anyone's head. I didn't kidnap anybody. I didn't rob a bank. I didn't shoot anybody. I see a lot of things in the paper about stuff like that and those are people who are getting life sentences.

He also stated, "I'm sorry for what I put everybody through, including myself and my children, [R.A.'s mother,] and her children. I mean my friends, I put them through hell, other people." When asked to write out his version of events for the PSI, Oliver simply stated, "I just wanted to say that everyone involved in this has suffered but the punishment does not fit the crime. Plus the punishment really should be shared. Everyone involved knows right from wrong." Oliver's unwillingness to accept responsibility for his actions, or to accept that he has committed a serious crime, further convinces us that Oliver's individualized challenge claiming gross disproportionality fails.

For sixteen years, Oliver has demonstrated an inability to conform his conduct to the law. Some of these violations have been relatively minor misdemeanors while others have been felonies. In particular, Oliver has demonstrated an inability to conform his actions to society's

expectations regarding minors, having been convicted of supplying alcohol to a minor and twice convicted of statutory rape. By violating residency requirements imposed on sex offenders, Oliver has also shown he is unwilling to comply with the safeguards the legislature has mandated to protect children from sexual criminals. Oliver has not acknowledged his crime, nor its severity, claiming that "the punishment really should be shared" and that "[e]veryone involved knows right from wrong." The nature of Oliver's past and present crimes, the narrow scope of section 902.14, and Oliver's attitude towards his criminal behavior lead us to conclude that section 902.14 does not impose a grossly disproportionate penalty on Oliver.

After reviewing Oliver's case and comparing the gravity of his crime to the penalty mandated by the statute, we do not feel that section 902.14 imposes an unconstitutional punishment on Oliver. Oliver's sentence does not lead to an inference of gross disproportionality. Oliver has committed multiple crimes as an adult and has an extensive criminal history. He has shown a lack of remorse and an inability to be rehabilitated. Based on the facts of his case, life without parole does not strike us as a grossly disproportionate punishment to his crimes. Since the penalty does not lead to an inference of gross disproportionality, we need not proceed to steps two and three of the analysis, the intrajurisdictional and interjurisdictional comparisons. *Bruegger*, 773 N.W.2d at 873.

## VI. Disposition.

Oliver committed third-degree sexual abuse twice in a period of ten years. The legislature has chosen to harshly punish those who repeatedly engage in a variety of sex acts with children by imposing Iowa's most severe sentence, life without parole, on them. Our role is not

to determine what the proper sentence for a crime should be. Instead, we are to review the sentence mandated by the legislature to ensure that it is within the protections ensured by the State and Federal Constitutions. In this case, the legislature has chosen to permanently confine those who have shown, on multiple occasions, that they are unwilling to follow society's restrictions regarding sexual contact between children and adults. We see no constitutional infirmity in that decision.

Even if the penalty of life without parole is not categorically prohibited for violations of section 902.14, Oliver claims the sentence imposed is grossly disproportionate to his particular acts. Again, we disagree. Oliver committed both of his crimes well beyond his eighteenth birthday. He has committed other crimes that indicate an unwillingness to comply with society's rules regarding both minors and sexual behavior. While Oliver claims that his crimes were not physically violent, they are still emotionally, psychologically and physically damaging to the child being exploited. The penalty of life without parole is within the boundaries imposed upon the legislature's discretion by the state and federal constitutions, and the penalty is not cruel and unusual when considered in light of the particular facts of Oliver's case.

The sentence imposed by the district court is affirmed.

**AFFIRMED.**