# IN THE COURT OF APPEALS OF IOWA

No. 21-1402
Filed September 13, 2023


**STATE OF IOWA,**
       Plaintiff-Appellee,

**vs.**

**CAINE WILLIAM DOMINGUEZ-SCHIESL,**
       Defendant-Appellant.
_____

Appeal from the Iowa District Court for Polk County, Scott J. Beattie (pretrial motions) and Jeanie Vaudt (trial and sentencing), Judges.


A defendant appeals his convictions and sentence for two counts of attempted murder, intimidation with a dangerous weapon, and willful injury. **AFFIRMED.**


Kelsey Knight (until withdrawal) of Carr Law Firm, P.L.C., Des Moines, and R. Ben Stone of Parrish Kruidenier Law Firm, Des Moines, for appellant.

Brenna Bird, Attorney General, and Louis S. Sloven, Assistant Attorney General, for appellee.


Considered by Bower, C.J., and Tabor and Greer, JJ.

**TABOR, Judge.**

A jury found Caine Dominguez-Schiesl guilty of intimidation with a dangerous weapon, willful injury, and two counts of attempted murder.[1] These convictions stem from the late-night drive-by shooting of a Des Moines home. On appeal, he argues the district court abused its discretion in admitting unfairly prejudicial evidence and denying his motion for mistrial. He also claims the State presented insufficient evidence to support his four convictions. And he contends his indeterminate forty-five-year prison sentence constitutes cruel and unusual punishment. Finding no reversible error, we affirm his convictions and sentence.

## I.    Facts and Prior Proceedings

"Surprise!  Happy Birthday!"  That was the welcome given B.M. as she came home from work to a party planned by her sixteen-year-old sister, N.M. That evening in March 2021, friends and family celebrated at N.M.'s home where she lived with her mother, older sister, younger brother, and nephew. As the party wound down, B.M. and all the guests left the house. Their mother was not home, so N.M. watched her eight-year-old brother, B.C., and two-year-old nephew, D.M.

By 10:00 p.m., B.C. was asleep in his room and D.M. was watching *Cocomelon* cartoons on the couch. About forty-five minutes later, N.M. stepped outside to grab a phone charger from her mother's Ford Escape in the driveway. As she reached the Escape, a sport utility vehicle (SUV) pulled up to the driveway.[2] She recalled that four people were inside. One of them said something to her, and

---

[1] In the briefs, the State refers to the defendant as Schiesl. Defense counsel uses Dominguez. We will follow the second approach.

[2] N.M. testified that the SUV was silver. But other witnesses and footage from neighbors' security cameras showed that the SUV was a dark color.

she asked: "Who is that?"  The person replied: "You know who this is."  And then "started shooting."[3]

N.M. dived into the Escape to avoid the barrage of gunfire.  A neighbor's security camera picked up what sounded like "multiple firearms" unleashing more than three dozen shots.  Based on the shell casings recovered, the SUV occupants fired at least thirty-eight rounds.  They hit the Escape eleven times, and the house sixteen times—nine of those bullets penetrated the walls.

The onslaught lasted about ten seconds.  When the SUV drove off, N.M. tried to reenter the house, but couldn't get inside.  "I seen the house was shot up and the door was, like, jammed."  Unable to find her phone, she ran to neighboring houses for help.  One neighbor, Adan, heard the gunshots and stepped outside.  He saw a "dark color[ed]" SUV drive away and "a young girl run to the neighbors, like, knocking at the doors."  Adan let N.M. use his wife's phone to call 911.  As N.M. made that call, B.C. ran out of the house.  He exclaimed that D.M. had been shot.  N.M. went into the house and relayed to emergency responders that her two-year-old nephew was "bleeding in his head."[4]

As medics attended to the toddler, Des Moines police launched their investigation.  Based on witness statements and security footage, police identified

---

[3] Early in their investigation, Des Moines police realized that the shooters had targeted N.M.'s household.  Detective Jeffrey Shannon testified that N.M.'s uncle had been involved in gun violence and family members said there was animosity between two tribal groups originating in Sudan.

[4] Skipping forward, D.M. survived his life-threatening brain injury.  But his doctor testified that "there are a lot of unknowns."  D.M.'s right hand was "weak or altered" and he would be on seizure "medications for the rest of his life."

the shooters' vehicle as a black Nissan Rogue. They broadcast a description of the suspect SUV to other law enforcement agencies.

Less than two hours after the shooting, a passerby reported a single-car crash on westbound Interstate 80 in Dallas County. That car, a Nissan Rogue, was pushed against the cable bordering the median. It was missing a front wheel and the airbags had deployed.

Both the Iowa State Patrol and Dallas County Sheriff's Office responded to the accident. The driver—Thon Bol—told Deputy Nicholas Merwald that he hit a deer.[5] When asked if they needed medical attention, the driver responded for the group, saying they were all "good" and that his sister was on her way. The other four passengers were Dominguez, Odol Othow, Reath Yak, and Owo Bol.[6] Deputy Merwald then asked if they wanted to get out of the SUV. Again, Thon declined on behalf of the group. While Merwald ran Thon's license through the database, Trooper Kyle Ratzesberger asked the driver to step out of the vehicle. Thon climbed across the front passenger seat to avoid the deployed airbag. As Thon exited, Ratzesberger saw "an expelled [9-millimeter] casing on the floorboard."

Meanwhile, Dallas County officials informed Des Moines police that the crashed Nissan matched the description of the SUV involved in the shooting. Two Des Moines officers drove to the accident scene. Now with three agencies on hand, officers arrested the four remaining passengers. Officers also seized two 9-

---

[5] Seeing frozen condensation on the Nissan's windshield, Merwald estimated that the SUV had been there for "at least half an hour."
[6] Because two of the occupants are brothers who shared a surname, we will use their first names.

millimeter pistols—one Glock 19 and one Smith & Wesson—from Owo. He had been sitting next to Dominguez in the backseat.

While this was going on, Thon was on the phone with his sister in the front seat of Trooper Ratzesberger's patrol car.[7] Thon explained their predicament and confided that they had three guns in the Nissan. She asked him who was with him. Thon identified each passenger, including Dominguez, on a first-name basis. He also told his sister: "we hid it," referring to one of the guns.

After arresting the occupants, officers searched the SUV. They found an ammunition magazine on the backseat floor. And under the driver's seat, they discovered a second magazine, a third pistol (another Glock), and a water bottle containing six spent shell casings. Eight more shell casings were lodged between the windshield and hood. Plus, more casings were scattered throughout the passenger area. At that point, investigators knew "the manufacture and caliber of shell casing was consistent" between those recovered from the crime scene and those found in the disabled SUV.

To connect those two scenes, police interviewed all five suspects. During his interview, Dominguez said he was from Omaha, Nebraska. When asked why he was in Iowa, Dominguez responded that he was "seeing what's up in Des Moines, I've heard a lot about it." He claimed that he couldn't remember much about that night until the SUV crashed on the interstate. He denied knowing the names of the other occupants and said they "were not really" friends. He recounted

---

[7] Thon and his sister spoke in a mixture of English, Arabic, and Nuer—an African dialect spoken in Sudan. An interpreter proficient in all those languages translated the recorded conversation for the jurors.

that, at some point, he'd been eating a McChicken at McDonalds—somewhere outside of Des Moines—when he met the other four suspects. They agreed to give him a ride because they were all "going the same way, same direction." Dominguez denied knowing anything about the guns found in the SUV.

Dominguez's companions were just as evasive during their interviews. But officers did gain some information. For instance, Owo told officers that he and Thon were from Sioux City. Owo said others were from Omaha. And they were "all friends"—including Dominguez. In his interview, Yak said he was from Storm Lake; the SUV belonged to his parents. When police told Yak that a two-year-old had been injured in the shooting, Yak replied: "Is that who came to the door?"

Beyond those interviews, police pulled information from the suspects' cell phones. Location data on Dominguez's phone placed him near Council Bluffs at about 8:15 p.m. the night of the shooting.[8] Officers also discovered two videos that featured Dominguez holding a firearm. The first was a Snapchat video showing Dominguez ejecting a round from a Smith & Wesson pistol before pointing it at the camera and pulling the trigger. A close-up on the serial number proved it was the same gun seized from Owo at the accident scene. Dominguez saved that video to his phone about nine hours before the shooting.

The second video was taken by Owo from the backseat of the Nissan. Owo filmed the thirty-second clip which opens with him pointing a Glock at the camera. The video then pans to Othow holding the extended Glock magazine.

---

[8] Council Bluffs is about a two-hour drive from Des Moines. So, as police deduced, it was possible for him to travel to N.M.'s house by the time of the shooting.

Investigators believed that the third person in the video was Dominguez, who was holding another handgun. Owo saved that video to his phone after the shooting.

The State charged Dominguez and his four companions with three counts of attempted murder, class "B" felonies, and one count of intimidation with a dangerous weapon, a class "C" felony. The State later amended that trial information—dropping one attempted-murder count and adding a charge for willful injury, a class "C" felony.

Dominguez stood trial in July 2021.[9] The jury found him guilty as charged. At sentencing, the district court imposed a term not to exceed forty-five years in prison. He is eligible for parole after serving twenty-seven-and-a-half years.

Dominguez now appeals, making four arguments.

## II. Analysis

### A. Admissibility of Snapchat Video and Motion for Mistrial

Before analyzing the admissibility of the Snapchat video and the necessity of a mistrial, we offer some background for context. Before trial, the State gave notice of its intent to offer the Snapchat video found on Dominguez's phone, along with a still image focused on the gun's serial number. Dominguez moved to exclude those exhibits under Iowa Rule of Evidence 5.403, but the district court found them admissible.

---

[9] This was the State's second effort to try Dominguez. In May 2021, a trial began involving all five defendants. But during opening statements, Dominguez's attorney asserted that her client was the only defendant who was not Sudanese and did not have the tribal allegiances that contributed to the motive for the shooting. Counsel for three of the other defendants moved for a mistrial. The court denied the motion for mistrial but granted motions to sever because of the mutually antagonistic defenses.

At a pretrial conference, Dominguez's attorney discussed renewing the objection:

> I just want to put on the record that I am hereby renewing my objection for purposes of preserving error. And at the time of trial in which the State intends to offer those two pieces of evidence, based upon recent case law, I believe I need to on the record state an objection.
>
> I would just propose that I say "Objection, Your Honor," and then the Court says "Overruled" or something to that nature, "Overruled based on the prior order," something like that so that I've preserved it in the record during the trial and I don't run the risk of not having preserved it.
>
> I understand they're coming in. I'm prepared for that. But my client's rights need to be preserved. So I would ask that that be how we proceed with it at trial.

The State resisted Dominguez's objection but agreed with the proposed process preserving error during trial. The district court told the parties: "I'm going to allow [the evidence] to be admitted." The court concluded by stating: "So when we get to that point in the record, we'll just do what we have already indicated that we will do, and then we don't have to stop unless something else comes up, and we can handle it in the first break in the morning or at noon."

But things did not go as planned at trial. When the State moved to publish the Snapchat video and still image, the following exchange occurred:

> [DEFENSE]: Your Honor, at this time I would renew my objection.
> THE COURT: Noted.
> [THE STATE]: Your Honor, we'd just ask the judge— or we respectfully ask that there's no basis for the objection and ask the Court to overrule.
> THE COURT: I agree. Overruled. You may proceed . . . .
> [DEFENSE]: Your Honor, may we approach?

The district court then excused the jurors so that Dominguez's attorney could move for a mistrial. His attorney claimed that this exchange had "poisoned

the jury" and that it was "in violation of the agreement that we put on the record" before trial. The prosecutor agreed that Dominguez's attorney was "correct in the sense that we weren't going to go there. But, based on the tense nature of trying to tie together how this defendant and others shot a two-year-old, I just did not hear the Court. I was prepared for my next question, and I just responded." The court denied the mistrial motion but told Dominguez that it would consider any curative instruction he put forward. He did not offer one.

### 1. Was the Snapchat video unfairly prejudicial?

Dominguez first claims that the district court shouldn't have admitted the Snapchat video of him brandishing the Smith & Wesson pistol and the accompanying still image of its serial number. He contends this evidence was "substantially more prejudicial than probative" under Iowa Rule of Evidence 5.403.

We review this evidentiary ruling for an abuse of discretion. *State v. Liggins*, 978 N.W.2d 406, 422 (Iowa 2022). A court abuses its discretion by admitting evidence "on grounds or for reasons clearly untenable or to an extent clearly unreasonable." *State v. Parker*, 747 N.W.2d 196, 203 (Iowa 2008) (citations omitted). An untenable reason is not supported by substantial evidence or based on an erroneous application of law. *Id.*

Under rule 5.403, a court may exclude relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice. Evidence is unfairly prejudicial if it appeals to the jurors' sympathies, arouses their sense of horror, provokes an instinct to punish, or motivates them to reach a decision fueled by something other than the facts in the record. *State v. Neiderbach*, 837 N.W.2d

180, 202 (Iowa 2013). In short, unfairly prejudicial evidence "prompts the jury to make a decision on an improper basis." *Liggins*, 978 N.W.2d, 422.

To apply this rule, courts ask two questions. First, what is the probative value of the evidence? *See State v. Buelow*, 951 N.W.2d 879, 889 (Iowa 2020). And second, does the danger of its wrongful effect on the jury weigh heavily against that probative value? *Id.* This second question calls for a balancing test. *State v. Divis*, No. 15-1123, 2016 WL 4803749, at *6 (Iowa Ct. App. Sept. 14, 2016). And if the scale tips toward the wrongful effect, exclusion may be warranted. *Id.* (citing *State v. Richards*, 879 N.W.2d 140, 145 n.1 (Iowa 2016)).

Starting with the question of probative value, the district court found that the Snapchat video was "relevant to the issues of the possession of the weapons." On appeal, the State expands on the probative value of that evidence in linking Dominguez to the shooting. It points out that the serial number confirms that the Smith & Wesson in the video was the gun found on Owo after he had been sitting next to Dominguez in the crashed SUV. And a state criminalist testified that bullets recovered from the crime scene—including the one that injured D.M.—were fired by that gun.

In response, Dominguez claims the probative value of the evidence was low because the State did not prove when the Snapchat video was taken. He states, "it is not sufficiently probative that at one time prior to his arrest [Dominguez] was holding a gun in a Snapchat video." He asserts his previous handling of the pistol "is in no way connected to the issue at hand." Then focusing on the balancing test, Dominguez contends that the danger of unfair prejudice was high. In his view, the

video risked "potentially misleading the jury" because his act of pulling the trigger was similar to the conduct with which he was charged.

When we apply rule 5.403, we find any unfair prejudice arising from the Snapchat video and still image did not substantially outweigh their probative value. Dominguez's possession of the pistol used in the shooting rebutted his claim he wasn't involved. *See State v. Andrews*, No. 11-1672, 2012 WL 4513901, at *4 (Iowa Ct. App. Oct. 3, 2012). And the video—recovered from his phone—contradicted his statement to police that he did not know of any firearms in the SUV. *See State v. Ratliff*, No. 18-0098, 2019 WL 2153097, at *6 (Iowa Ct. App. May 15, 2019). True, the date of the recording is unknown. But that temporal concern is tempered by the fact it was saved to Dominguez's phone nine hours before the shooting and he had on the same sweatshirt in the video as he was wearing at the time of his arrest.

On prejudice, we agree the jurors may have viewed Dominguez's act of pointing the pistol at the camera as threatening. *See State v. Brown*, No. 18-1988, 2020 WL 1879686, at *6 (Iowa Ct. App. Apr. 15, 2020). But Dominguez's actions in the video did not rise to the level of a criminal act and were not likely to mislead the jury to convict. *Id.* Without more, we cannot say the danger of unfair prejudice substantially outweighed the exhibit's probative value. Thus, we decline to find an abuse of discretion.

## 2. Did the district court's statement merit a mistrial?

Dominguez's second claim also involves that Snapchat video and still image. Recall that when defense counsel renewed its opposition to these exhibits at trial, the prosecutor said there was "no basis for the objection." The court

responded: "I agree." The defense moved for a mistrial, alleging the prosecutor's objection and the court's response "poisoned the jury."

The court overruled the mistrial motion. In doing so, the court pointed to two stock jury instructions. The first tells the jury that nothing the judge "has said or done during the trial was intended to give any opinion as to the facts, proof, or what your verdict should be." The second informs the jury that objections and rulings on objections are not evidence. The court also left the door open to another curative instruction.

Dominguez reprises his argument on appeal, contending the court's comment was "highly prejudicial" and led the jurors to believe that his trial attorney made "a frivolous objection" to the evidence. The defense notes that it took pains to settle the evidentiary challenges outside the presence of the jury.

We review rulings on mistrial motions for an abuse of discretion. *State v. Newell*, 710 N.W.2d 6, 32 (Iowa 2006). We reverse only when the court exercises its broad discretion in an unreasonable way or on untenable grounds. *State v. Huser*, 894 N.W.2d 472, 498 (Iowa 2017). Denying a motion for mistrial is an abuse of discretion when the accused shows "prejudice which prevents him from having a fair trial." *State v. Callender*, 444 N.W.2d 768, 770 (Iowa Ct. App. 1989).

Considering the broad discretion granted to the district court, we decline to reverse. We recognize that "a judge's fleeting remark may carry great—even controlling—weight with the jury." *State v. Reed*, 482 N.W.2d 672, 675 (Iowa 1992) (citation omitted). But Dominguez fails to show that the court's isolated statement unduly influenced the jury or rendered his trial unfair. *See State v. Kimball*, 176 N.W.2d 864, 867 (Iowa 1970). And we agree with the court's observations that the

uniform jury instructions lessened the risk of prejudice. *See State v. Belken*, 633 N.W.2d 786, 796 (Iowa 2001) (presuming juries adhere to curative instructions). What's more, if Dominguez believed the danger of prejudice remained high after those instructions, he could have proposed a more specific admonishment for the jury. Under these circumstances, we decline to grant a new trial on this issue.

## B. Sufficiency of the Evidence

Dominguez next claims the State offered insufficient evidence to support his four convictions. We review sufficiency claims for correction of legal error. *State v. Crawford*, 974 N.W.2d 510, 516 (Iowa 2022). We consider whether, when taken in the light most favorable to the State, the verdicts are supported by substantial evidence. *Id.* Evidence is substantial if it would convince a rational factfinder of guilt beyond a reasonable doubt. *See id.* But evidence that does no more than raise suspicion, speculation, or conjecture is insufficient. *State v. West Vangen*, 975 N.W.2d 344, 349 (Iowa 2022).

At trial, the prosecution advanced two theories: one, Dominguez engaged in the shooting or two, he aided and abetted the shooters. Iowa Code § 703.1. (2021).[10] And the court instructed the jury that it did not need to be unanimous on

---

[10] For the attempted murder counts, the State had to prove:
      1. On or about March 1, 2021, the Defendant or someone he aided and abetted shot firearms at N.M. [and D.M. and/or B.C.].
      2. By his acts, the Defendant or someone he aided and abetted expected to set in motion a force or chain of events, which would have caused or resulted in the death of N.M. [and D.M. and/or B.C.].
      3. When the Defendant or someone he aided and abetted acted, he specifically intended to cause the death of N.M. [and D.M. and/or B.C.].
For intimidation with a danger weapon, the State had to prove:

the theory, only on the verdict. On appeal, we focus on the second theory. *See* Iowa Code § 814.28 (allowing courts to affirm if sufficient evidence supports any theory presented).

Under that aiding-and-abetting theory, the jury could find Dominguez guilty if he knowingly approved and agreed to the commission of the crime, either by active participation or by encouraging the act before or during its commission. "Knowledge of the crime is essential . . . ." *Crawford*, 974 N.W.2d at 517. But not sufficient. *Id.* The State must do more than show Dominguez knew about the shooting or was present at the scene. *See id.* It must offer proof that he assented to the criminal acts with his direct involvement or by lending his approval ahead of time or while they were being carried out. *See State v. Lilly*, 930 N.W.2d 293, 308 (Iowa 2019). Circumstantial evidence of his presence, companionship, and conduct before and after commission of the crimes may contribute to that proof. *See State v. Brimmer*, 983 N.W.2d 247, 257 (Iowa 2022).

---

1. On or about March 1, 2021, the Defendant or someone he aided and abetted shot firearms into a home located at 1305 Jefferson, Des Moines with was occupied by D.M. and/or B.C.
2. A firearm is a dangerous weapon . . . .
3. D.M. and/or B.C. actually experienced fear of serious injury and their fear was reasonable under the existing circumstances.
4. The Defendant or someone he aided and abetted shot the dangerous weapon with the specific intent to injure or cause fear or anger in D.M. and/or B.C.

Finally, for willful injury, the State had to prove:

1. On or about March 1, 2021, the Defendant or someone he aided and abetted shot firearms into the home . . . [of N.M.]
2. The Defendant or someone he aided and abetted specifically intended to cause a serious injury to D.M. or any of the occupants of the home . . . .
3. The Defendant's act, or the act of someone he aided and abetted caused a serious injury to D.M. . . . .

On appeal, Dominguez ignores the State's aiding-and-abetting theory. He limits his attack to the State's proof that he acted as a principal. In that vein, he raises two general contentions. First, he "was never placed near the scene of the shooting and instead was located many miles from the scene and several hours later." And second, even if he were at the scene, "there is no indication that Dominguez would have known about the presence of the other two people in the home." Without that knowledge, Dominguez insists that he couldn't have had the specific intent necessary to commit the crimes charged.

Dominguez's first contention falls short. As the State argues, it did not have to prove that he pulled the trigger or was even present at the shooting. *See State v. McClelland*, 162 N.W.2d 457, 464 (Iowa 1968). To aid and abet a crime, encouragement is key. *State v. Rohm*, 609 N.W.2d 504, 510 (Iowa 2000) (defining "encourage" as "to inspire with courage, spirit, or hope; to spur on; to give help or patronage" (citation omitted)). To gage that encouragement, we may consider Dominguez's conduct before and after the shooting. *Id.* But his conduct after the shooting must show he supported the crime before it happened or while it was ongoing. *See State v. Hustead*, 538 N.W.2d 867, 870 (Iowa Ct. App. 1995).

The State offered sufficient evidence that Dominguez aided and abetted the shooting by encouraging or lending countenance to the endeavor. First, he saved a video of himself pulling the trigger on a Smith & Wesson pistol just nine hours before the shooting. That same pistol was used in the shooting and caused D.M.'s injuries. Second, the State offered another video filmed shortly after the shooting that showed Dominguez and two accomplices flashing guns in the backseat of the SUV. Third, Dominguez was a passenger in the SUV when it crashed on the

interstate just west of Polk County, less than two hours after the shooting. And fourth, police responding to that crash found the Smith & Wesson pistol on the accomplice next to Dominguez in the backseat. Given this timeline, a reasonable jury could infer that Dominguez, at a minimum, furnished the pistol to facilitate the shooting. *See State v. Jefferson*, 574 N.W.2d 268, 277 (Iowa 1997) (finding relevant that an aider and abettor "owned or furnished the pistol" in analyzing sufficiency of the evidence to support robbery conviction); *State v. Speaks*, 576 N.W.2d 629, 632 (Iowa Ct. App. 1998) (noting gun used to shoot victim "belonged to" aider and abettor in determining sufficiency of evidence to support murder conviction).

Beyond providing the pistol, Dominguez's conduct after the shooting was incriminating. In his police interview, Dominguez was evasive and untruthful. He denied knowing anything about the guns in the SUV or being friends with the other occupants. Further investigation proved both assertions to be false. Denying such material facts reveals Dominguez's guilty knowledge. *See State v. Cox*, 500 N.W.2d 23, 25 (Iowa 1993).

Next, we address Dominguez's intent argument. Under the State's aiding-and-abetting theory, Dominguez could be convicted if he participated with the requisite intent or knew the principals possessed that intent. *See State v. Tangie*, 616 N.W.2d 564, 574 (Iowa 2000). As the State points out, this was a "targeted shooting." And the jury could infer from the totality of evidence that Dominguez knew of his accomplices' intended target. Again, Dominguez had a connection to a pistol used in the shooting—uploading a video of himself pulling its trigger just hours before the shooting. What's more, circumstantial evidence placed

Dominguez with the accomplices on the trip to Des Moines. In fact, when interviewed by police, Dominguez acknowledged traveling with the others, but only because they were going the same way. He denied knowing their names. His lack of candor added to the circumstantial evidence of guilt. *See State v. Ernst*, 954 N.W.2d 50, 56–57 (Iowa 2021) (finding inference of guilt from defendant's false story). Then after the shooting, Dominguez appears in another video, in the backseat with two accomplices brandishing pistols.

As for knowing if anyone was inside the house, the jury heard Yak's inadvertent admission to police that someone "came to the door" before the shooting. Because they had time for an exchange with N.M. and to recognize that someone was in the house before firing over three dozen rounds, the jury could find Dominguez's accomplices acted with the requisite intent for each conviction. *See State v. Brown*, No. 02-0886, 2003 WL 1967828, at *5 (Iowa Ct. App. Apr. 30, 2003) (finding fact that defendants "shot at least eight rounds toward the victim, and in fact hit the victim with two shots, more than supports an inference that one or both of them had the specific intent to seriously injure and kill").

Viewing the record in the light most favorable to the verdicts, we find substantial evidence that Dominguez aided and abetted the crimes charged. *See State v. Davis*,183 N.W. 314, 316 (Iowa 1921). Reasonable jurors could find that his act of providing a gun used in the shooting and his interactions with the accomplices after the onslaught demonstrated his encouragement. The record also supports a finding that Dominguez knew that his accomplices acted with the intent to kill N.M. and her family members. We decline to disturb the jury verdicts.

## C. Cruel and Unusual Punishment

Finally, Dominguez contends that his consecutive sentences constitute cruel and unusual punishment.[11]  "An unconstitutional sentence is an illegal sentence."  *State v. Lyle*, 854 N.W.2d 378, 382 (Iowa 2014) (citing *State v. Bruegger*, 773 N.W.2d 862, 872 (Iowa 2009)).  We generally review sentencing challenges for legal error; but we review allegedly unconstitutional sentences de novo. *Id.*

To review, the district court imposed twenty-five-year sentences for Dominguez's two attempted murder convictions with a seventeen-and-a-half mandatory minimum for each.  The court ran those sentences concurrently.  He also received sentences not to exceed ten years, with five-year mandatory minimums, for both his intimidation and willful injury convictions.  The court ran those terms consecutively to each other and consecutively to the attempted-murder sentences.  The court based its decision on "the separate and serious nature of the offenses."  In sum, Dominguez faced a maximum term of forty-five years in prison—with a mandatory minimum of twenty-seven-and-a-half years.

Dominguez concedes that "some aspects of his sentence [are] statutorily mandated."  But he argues imposing consecutive terms "greatly extends the period

---

[11] Dominguez does not cite either the Eighth Amendment to the United States Constitution or article 17, section 1 of the Iowa Constitution.  "When a party does not specifically indicate whether a claim is based under the Iowa or Federal Constitution, both the state and federal claims are preserved." *State v. Sweet*, 879 N.W.2d 811, 817 (Iowa 2016).  We apply the federal framework when a different standard is not presented under the Iowa Constitution—reserving the right to apply that framework differently.  *Id.*  The gross-disproportionality review under our state constitution is more stringent than its federal counterpart.  *State v. Oliver*, 812 N.W.2d 636, 650 (Iowa 2012).

of time which [he] would serve and make it harder for him to rejoin society." He contends that the consecutive sentences are cruel and unusual given his "young age, potential for growth and change, and his challenging upbringing."

Before reaching the merits of his arguments, we must clarify what test to apply. In asserting their right against cruel and unusual punishment, defendants may advance either a categorical or a gross-disproportionality challenge to their sentence. *Oliver*, 812 N.W.2d at 639–40. A categorical challenge attacks the general sentencing practice. *Id.* By contrast, a gross-disproportionality challenge compares the harshness of a particular sentence with the seriousness of the crime. *Id.* In his brief, Dominguez styles his challenge as categorical, but his argument focuses on his specific background. So we treat his argument as a gross-disproportionality challenge. *See Bruegger*, 773 N.W.2d at 884.

We employ a three-step test to decide whether his sentence is grossly disproportionate to his crimes. *See Dorsey v. State*, 975 N.W.2d 356, 363 (Iowa 2022). First, we balance the gravity of the crimes against the severity of the sentence. *Id.* If we find no inference of gross disproportionality, our inquiry ends. *State v. Wickes*, 910 N.W.2d 554, 572 (Iowa 2018). So three steps can turn into one. *Dorsey*, 975 N.W.2d at 363. But if Dominguez meets the threshold inquiry, we take the second step of comparing his sentence to others for comparable crimes in Iowa and the third step of comparing his sentence to those for comparable crimes in other jurisdictions. *See id.*

In deciding whether Dominguez meets the threshold inquiry, we give "substantial deference to the penalties the legislature has established for various crimes." *Oliver*, 812 N.W.2d at 650. Yet we are mindful that the constitutional

protection against cruel and unusual punishment "is designed to curb legislative excesses." *State v. Null*, 836 N.W.2d 41, 58 (Iowa 2013). While Iowa courts rarely find a sentence to be grossly disproportionate to the crime, our review is not "toothless" under the state constitution. *See Bruegger*, 773 N.W.2d at 883.

In conducting our constitutional review—with teeth—we consider whether "an unusual combination of features" converge to generate "a high risk of potential gross disproportionality." *Id.* at 884. That review examines whether the crime at issue is "broadly framed." *Id.* at 885. And whether the defendant is a recidivist or first-time offender. *See Oliver*, 812 N.W.2d at 650 (noting recidivists are "more culpable and thus more deserving of a longer sentence").

We start with the framing of the offenses for which Dominguez was sentenced. Attempted murder, intimidation with a dangerous weapon, and willful injury are all violent offenses requiring proof of the perpetrators' specific intent to kill or seriously injure the victims. *See Solem v. Helm*, 463 U.S. 277, 292–93 (1983) ("[N]onviolent crimes are less serious than crimes marked by violence or the threat of violence."). Dominguez does not argue that he committed acts of "lesser culpability within the scope of broad criminal statutes carrying stiff penalties." *See Bruegger*, 773 N.W.2d at 884. And the gravity of the offenses committed here is reflected in N.M's victim impact statement:

> My life was affected a lot by this. I could have lost my life that day, my little brother and my nephew too. I can't never go back to my childhood home, I can never go sleep back in my room. My house is damaged, I don't feel comfortable ever going back. My nephew was shot too. He is so innocent for something like that to happen to him.

The effect of the shooting on N.M., B.C., D.M., and their entire family is an aggravating factor that we must consider. *Id.* at 886.

We next consider Dominguez's recidivism. The presentence investigation (PSI) report shows that he had several juvenile delinquency adjudications, including assaults. He was placed at the State Training School and resided there until he turned eighteen. After his release, he moved to Omaha, where he was unemployed and lived with friends. He told the PSI investigator that he took medications for his mental health while at the State Training School, but stopped after his discharge. His history of delinquency and inability to respond to services weigh against his claim of gross disproportionality. *See id.* at 886 (considering factors "that tend to aggravate the gravity of the offense").

Finally, we turn to the heart of Dominguez's constitutional claim—his age. At the time of the shooting, Dominguez was eighteen—the youngest of his accomplices. He argues that, despite being an adult, his status as a teenager is relevant in determining punishment. In making this argument, Dominguez highlights our supreme court's recognition that many transient factors that make juveniles less culpable—such as still-developing impulse control, risk calculation, and the regulation of emotions—linger past the age of majority. *Null*, 836 N.W.2d at 55 (citing studies that "the human brain continues to mature into the early twenties").

In defense of the sentence, the State does not dispute that Dominguez possesses the same transient qualities as a juvenile. Instead, it points out that Dominguez is not entitled to the unique youth-based protections of juveniles because he turned eighteen. True, Dominguez was seven months too late to be

afforded our state's more robust constitutional protections for youth under the current law.[12] *See Dorsey*, 975 N.W.2d at 363 (discussing categorical distinction).

But drawing the line at eighteen for categorical challenges doesn't mean an offender's age will never factor into the disproportionality analysis. *Bruegger*, 773 N.W.2d at 883–84. Indeed, we've considered the age of adult offenders as relevant to our threshold inquiry. *See, e.g.*, *State v. Newell*, No. 13-1436, 2015 WL 566654, at *7 (Iowa Ct. App. Feb. 11, 2015) (thirty-five); *State v. Ryun*, No. 14-0559, 2014 WL 6977253, at *3 (Iowa Ct. App. Dec. 10, 2014) (twenty-two); *State v. Cox*, No. 13-0991, 2014 WL 4230196, at *3 (Iowa Ct. App. Aug. 27, 2014) (twenty-nine). And in deciding whether Dominguez's age combines with other factors to create a high risk of gross disproportionality, we know that "youth is more than a chronological fact." *Eddings v. Oklahoma*, 455 U.S. 104, 115 (1982).

Even the typical eighteen-year-old lacks the maturity of an older adult, and Dominguez was not a typical eighteen-year-old. *See id.* No question, he endured a traumatic upbringing. *See Oliver*, 812 N.W.2d at 650. According to the PSI, his father was imprisoned when Dominguez was young and his mother abused drugs. He was removed from parental care and placed with relatives starting at age three. For the next decade, Dominguez suffered physical abuse at his placements. He

---

[12] If not for those extra months, Dominguez would receive constitutional protections recognizing his lesser culpability. *See State v. Pearson*, 836 N.W.2d 88, 96 (Iowa 2013) (holding lengthy imprisonment from consecutive sentences triggered protections for seventeen-year-old defendant). While we must follow our supreme court's line-drawing at age eighteen, we recognize that punishments declared constitutional today "may later come to be seen as fundamentally repugnant" to our constitutional values as our society grows in understanding. *See Lyle*, 854 N.W.2d at 384–85; *see also People v. Parks*, 987 N.W.2d 161, 176 (Mich. 2022) (applying cruel-and-unusual-punishment test for juveniles under Michigan's constitution to eighteen-year-olds convicted of first-degree murder).

also witnessed domestic abuse and other violent events, telling one counselor that he'd seen "someone shot at age three" and "someone killed at age ten." Dominguez was later placed with a foster family that adopted him. Since then, he's been diagnosed with post-traumatic stress disorder, oppositional defiant disorder, depression, and anxiety.

Without minimizing Dominguez's troubled childhood, his personal circumstances do not replicate the "unusual combination of features" pointing to gross disproportionality in *Bruegger*. *See* 773 N.W.2d at 884. We realize that Dominguez faces mandatory minimum terms that will stretch for more years than he has been alive. But when we add the aggravating factors to the mix, we find Dominguez's consecutive sentences do not pass the threshold inquiry for finding gross disproportionality. We decline to find his sentences unconstitutional.

**AFFIRMED.**